UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                Case No. 16-20576
                Hon. STEPHEN J. MURPHY

vs.


RANDY NIBUNGCO MONTANTE,

                Defendant.
_____/

MARGARET M. SMITH
United States Attorney's Office
211 W. Fort Street; Suite 2001
Detroit, MI 48226
313-226-9135
Email: margaret.smith@usdoj.gov

SANFORD A. SCHULMAN P-43230
Attorney for Defendant:
    RANDY NIBUNGCO MONANTE
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
saschulman@comcast.net
_____/

## DEFENDANT, RANDY NIBUNGCO MONTANTE'S SENTENCING MEMORANDUM

      NOW COMES the Defendant, RANDY NIBUNGCO MONANTE, by and

through his attorney, SANFORD A. SCHULMAN and respectfully submits on

behalf of the defendant, RANDY NIBUNGCO MONTANTE's this Sentencing

Memorandum and states as follows:

1

<u>BACKGROUND AND NATURE OF THE OFFENSE</u>

On August 23, 2016 a four-count indictment was returned charging the defendant with count one: Production of Pornography in violation of 18 USC Sec. 2251(a);(e); count two: Coercion and Enticement of a Minor in violation of 18 USC Sec. 2422(b); count three: Receipt of Child Pornography in violation of 18 USC Sec. 2252A(a)(2); and count four: Possession of Child Pornography in violation of 18 USC Sec. 2252(a)(5)(B).

On February 1, 2016, Mr. Montante pled guilty pursuant to a Rule 11 Plea Agreement to one count in the Indictment, Production of Child Pornography. Mr. Montante has no prior criminal history and had never been arrested prior to August 2016.  He has been detained and without bond since his arrest.  For the foregoing reasons, the defense would ask for a sentence of 15 years which is sufficient but not greater than necessary to satisfy all the factors Sec. 3553 factors.

A.    **Nature and Circumstances of Randy Montante's Offense and His History and Characteristics**

In approximately February 2016, Randy Montante was on the Omegle adult website.  The website is legal and is exclusively used by adults.[1]  The victim in this case created a profile and entered the forum under the identity 18/F/NY. (Eighteen-year-old female from New York).  Randy and the victim engaged in

---

1 Omegle is a free online chat website that allows users to socialize with others without the need to register. The service randomly pairs users in one-on-one chat sessions where they chat anonymously using the names "You" and "Stranger" or "Stranger 1" and "Stranger 2" in the case of Spy mode. The site was created by 18-year-old Leif K-Brooks of Brattleboro, Vermont, and was launched on March 25, 2009.[2][3] Less than a month after launch, Omegle garnered around 150,000 page views a day,[4] and in March 2009 the site introduced a video conferencing feature. The site now provides a mobile application that lets users chat with strangers from mobile devices.

non-sexual exchanges for two months.  Indeed, the victim stated she was a senior in high school, never indicated she was under the age of 18, mentioned she had been accepted to Rutgers College, drove a vehicle, and took on the persona of an eighteen-year old female from New York. (A copy of these emails and text messages are available)

At some point the discussions became flirtatious and was always mutual and consensual.   It was a mutual idea to exchange photographs and both Randy and the Victim expressed an emotional as well as a physical attraction.  In fact, at some point the parties participated in Skype meetings that lasted several hours, much of which was mundane. Prior to July,2016, there is no evidence of any text messages, emails or correspondence where the victim disclosed her true age or identity.

In July,2016, Randy was contacted by the victim's mother who advised him to have no further contact with the victim.  The two had been exchanging messages and chats for almost six months, the vast majority of which was non-sexual.  In August 2016, the Bayonne Police Department assumed the victim's identity and sent a message to Randy.  It is unclear whether Randy would have continued to contact the victim after August.  Randy was suspicious of the contact and asked some security questions which were answered correctly because the Bayonne Police Department were working with the victim. It was at this time that the Police, using the identity of the victim, revealed her true age. Unfortunately, Randy was too emotionally invested and during the conversation requested pornographic materials.

The presentence report indicates that a forensic analysis of the victim's cell phone was conducted.  In July 2016, the victim produced several videos listed in paragraphs 17 (a) through (d).  Randy never received these videos. The videos were never found on any of Randy's accounts, phones, or computers. It is unclear whether the victim produced those videos for Randy or for another individual but Randy has fully accepted his involvement but denies that he ever requested those videos or that they were sent to him.

Randy had never had a serious or long-term girlfriend prior to this and he is socially awkward. His interests and hobbies are more aligned with a 17 year-old male.  This case involves one and only one victim.  Review of his phone and/or computer revealed no other "victims" and other chats or child pornography, There is no other negative relevant conduct which is unusual for these type of cases.  No other victims or any other conduct that was not charged but considered other relevant conduct.

In summary, the victim's conduct was to portray herself as someone over the age of 18.  She acted "mature."  She was a 13-year-old conducting herself more as a 17-year-old.  Randy Montante, who had never had a girlfriend and minimal sexual experience, is 24 but his emotional level was more aligned with a 17-year-old. The victim made videos without solicitation that were found on her phone but never transferred. This is not to suggest that Randy is not accepting responsibility, but to put into context Randy's relative maturity so this Court can evaluate whether he is truly a threat to the community.

There are no allegations that the defendant had any physical contact with the victim, never met her and never intended on meeting the victim in person. There is no evidence or even suggestion that Randy has ever had any sexual contact with anyone under the age of 18. He never even suggested to the victim that they meet despite dozens of hours of discussions, most mundane.

In addition, Randy filed no pretrial motions (except as to bond), received no significant reduction in the charge and essentially pled guilty without any promise of a reduced sentence. Most importantly, he pled guilty at his first opportunity.

Factors to be considered by a court at sentencing are by now well established. *See* 18 U.S.C. § 3553(a); United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008). It is important to consider Randy Montante's personal circumstances in evaluating and consideration a fair sentence. As Justice O'Connor recognized in her concurring opinion in California v. Brown, 479 U.S. 538, 545 (1987), "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *See also*, Porter v. McCollum, 130 S. Ct. 447, 454 (2009).

Randy Montante has no prior criminal history.  No prior contact with any law enforcement and has never even been accused or charged with an any other offense.  He has accepted responsibility and has expressed his sincere remorse for his actions.

Randy is 24 years old and at the time of his arrest in this case was employed and scheduled to graduate from the University of Michigan with a degree in History and Political Science.  As a result of this conviction his life and the life of his parents have been significantly and materially impacted.

A psychiatric evaluation was conducted by Dr. Gerald A. Shiener. According to Dr. Shiener, after reviewing the discovery materials and performing an evaluation, he concluded that there is no evidence in any of his history, past behavior or current situation that would indicate that Randy Montante has any tendencies to act as a pedophile. (See attached Report of Dr. Gerald Shiener, filed under seal).

Randy has no history of any other acting out behavior or poor impulse control.  He comes from a traditional nuclear family and manifests a very traditional work ethic, religious ethic and sexual ethic. Indeed, Dr. Gerald Shiener noted that: "[t]here is no evidence in his psychiatric evaluation, psychiatric history, legal history or behavior that would suggest that he would pose any risk to the community were he be released on bond.  Furthermore, he is remorseful for his activities after his period of confinement, and although he professed a willingness to attempt to endure whatever consequences he would face in his conversations with me, he did not display, profess or acknowledge any desire to

maintain any further contact with his chat partner which I consider consistent with my opinion that he does not represent any risk to the community should he be released on bond."

While this Court must still correctly calculate the guideline range, Gall v. United States, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; Nelson v. United States, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). Kimbrough v United States, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," id. at 49-50, and explain how the facts relate to the purposes of sentencing. Id. at 53-60; Pepper v. United States, 131 S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Id. at 101; Pepper, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101-02 (internal punctuation omitted) (citing Rita v. United States, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the Supreme Court held in Kimbrough, because "the cocaine Guidelines, like all

other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Kimbrough, 552 U.S. at 91, 109-10; see also Spears v. United States, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances. In Vazquez v. United States, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. at 11, Vazquez v. United States, No. 09-5370 (Nov. 2009). As the Sixth Circuit has previously recognized, "all of the sentencing guidelines are advisory," including those directed by Congress. United States v. Michael, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." Id. at 328.

B.    **Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

The empirical evidence is unanimous that there is no relationship between

sentence length and general or specific deterrence, regardless of the type of

crime.  See Andrew von Hirsch et al., Criminal Deterrence and Sentence

Severity: An Analysis of Recent Research (1999) (concluding that "correlations

between sentence severity and crime rates . . . were not sufficient to achieve

statistical significance," and that "the studies reviewed do not provide a basis for

inferring that increasing the severity of sentences generally is capable of

enhancing deterrent effects"); Michael Tonry, Purposes and Functions of

Sentencing, 34 Crime and Justice: A Review of Research 2829 (2006)

("[I]ncreases in severity of punishments do not yield significant (if any) marginal

deterrent effects. . . . Three National Academy of Science panels, all appointed

by Republican presidents, reached that conclusion, as has every major survey of

the evidence."); David Weisburd et al., Specific Deterrence in a Sample of

Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding

no difference in deterrence for white collar offenders between probation and

imprisonment); Donald P. Green & Daniel Winik, Using Random Judge

Assignments to Estimate the Effects of Incarceration and Probation on

Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a

thousand offenders whose sentences varied substantially in prison time and

probation found that such variations "have no detectable effect on rates of re-

arrest," and that "[t]hose assigned by chance to receive prison time and their

counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected.  The guidelines' offense level is not intended or designed to predict recidivism."  U.S. Sent'g Comm'n, Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"].   And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."  Francis T. Cullen et al., Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011).

Nor does lengthy imprisonment of production of child pornography have any deterrent or preventive effect on the production or dissemination of child pornography.  Because the production and dissemination of child pornography is a widespread, international problem.  There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet."  Beiermann, 599 F. Supp. 2d at 1103; id. at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").  The Commission

acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing."  Child Porn Report at 98.

      C.      **Need for Incapacitation**, 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children.   This belief is contrary to the empirical research in general, and is unjustified based on the evidence in this case.

In short, Mr. Montante's age, strong family support, education and potential for gainful employment until his arrest and his willingness to participate in cognitive behavioral therapy strongly support the conclusion that he is most unlikely to re-offend.

      II.      <u>The Requested Sentence Avoids Unwarranted Disparities and Unwarranted Similarities.</u>

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing.  "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing."  U.S. Sent'g Comm'n, Fifteen Years of Guidelines Sentencing:  An Assessment of How Well

the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform 113 (2004).

The guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case.  The guideline range fails to take into account any of Mr. Montante's characteristics demonstrating that there is no need to imprison him beyond the fifteen-year mandatory minimum to protect the public and that treatment and rehabilitation will be achieved in the most effective manner in the community.

 In this case, a substantial variance is necessary to avoid unwarranted uniformity between Mr. Montante and dissimilar defendants who committed dissimilar conduct.  See Gall, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself.  Kimbrough, 552 U.S. at 108.  The data shows that a sentence of fifteen years in prison and supervised release for ten years would not create unwarranted disparity.  Indeed, it would be difficult to find a state court that would impose any sentence even close to this for the similar conduct.  In addition, many federal courts have imposed sentences far lower where there was physical contact between the child victim and the defendant charged.

In fiscal year 2011, only 32.8% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range, and 65.6% were

below the range.  Judges imposed below-range sentences in 48.1% of cases
without a government motion, in 14.6% of cases based on a government motion
for a variance, and in 3% of cases based on a government motion under § 5K1.1.
See U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics,
tbl.28.  In contrast, the average rate of below-range sentences without a
government motion in all cases was only 17.4% and the government sought
variances in only 4.4% of all cases.  Id.

In fiscal year 2011, forty-seven defendants sentenced under § 2G2.2
nationwide received no imprisonment or a term of imprisonment no more than six
months, and forty-four of these defendants were in Criminal History Category I
like Mr. Montante.  See Placement of Sentences Under U.S.S.G. §2G2.2 – FY
2011 at 4, http://www.fd.org/docs/select-topics---sentencing/ placement-of-
sentences-under-u-s-s-g-2g2-2---fy-2011.pdf?sfvrsn=4.  Of those forty-four
defendants in Criminal History Category I, four had an offense level (unadjusted
for acceptance of responsibility) of 33 (like Mr. Montante) or more.  Id. at 5.

In the Sixth Circuit in fiscal year 2011, 71.7% of defendants sentenced
under § 2G2.2 in Criminal History Category I were sentenced below the guideline
range, 53.8% without a government motion and 17.9% with a government
motion.  Appendix 1, tbl.1.  No defendant in Criminal History Category I with the
same four enhancements as Mr. Montante was sentenced within the range;
71.4% (five of seven) received a sentence below the range without a government
motion, and 28.6% (two of seven) received a sentence below the range with a
government motion.  Id. tbl.2.  Of the 146 defendants in Criminal History

Category I (including those subject to the 5-year mandatory minimum for receipt or distribution), seven defendants were sentenced to no imprisonment or imprisonment up to 6 months. Id. tbl.3.  Of all defendants in all criminal history categories convicted of the sale, distribution, transportation, shipment, receipt, or possession of child pornography, 5.5% received a sentence of straight probation, probation including home confinement, or a split sentence.

Finally, 57.1% of defendants sentenced under § 2G2.2 in the Eastern District of Michigan in fiscal year 2011 received a sentence below the guideline range without a government motion, 20.0% received a sentence below the guideline range with a government motion, and only 22.9% received a sentence within the guideline range.  Id. tbl.2.

III.     The Sentence Requested Meets the Purposes of Sentencing Under the Circumstances in this Case and Is Consistent with Recent Sixth Circuit Law.

This Court is required to consider "the kinds of sentences available" by statute.  18 U.S.C. § 3553(a)(3).  Congress has provided for a range of sentences, from a mandatory minimum sentence of 15 years to a statutory maximum sentence of Life.  See 18 U.S.C. §§ 2252(a)(4)(B), (b)(2), 3583(k).

I.  A SENTENCE OF THE MANDATORY MINIMUM OF 15 YEARS IS "sufficient, but not greater than necessary" to serve sentencing purposes under § 3553(a).

## FACTORS:

A.   **A mandatory minimum sentence of 15 years is sufficient punishment**.

Randy will be close to 40 years of age if this Court imposes a 15-year sentence.  Given that he has no prior record and there is no risk of recidivism, such a sentence appears sufficient.  He will suffer significant punishment in addition to incarceration that is set forth herein.

B.   **Defendant will be required to register on the Sex Offenders Registration Act.**

Mr. Montante must register as a sex offender, with the publication of that information to the community and his friends and neighbors.  As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.  See, e.g., United States v. Garate, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of Gall, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); United States v. Pauley, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after Gall, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," id. § 3553(a)(2)(A), and

"adequate deterrence," id. § 3553(a)(2)(B)); United States v. Gardellini, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

To the extent that the Sixth Circuit has suggested that the requirement that a defendant register as a sex offender is not relevant in reflecting just punishment, see United States v. Bistline, 665 F.3d 758, 765 (6th Cir. 2012) (rejecting district court's reliance on collateral consequence because it is not a consequence of the sentence, but of the conviction),

**C. Defendant has lost his employment and will have significant challenges seeking and obtaining gainful employment since this conviction.**

For more than two years Randy was employed and now he will have a federal felony and will be required to register on the sexual offenders' registration. He will have no employment for 15 years if sentenced to a 15-year sentence, and without education and work history his ability to obtain gainful employment will be severely restricted.

D.  **Defendant was forced to withdraw from school and has not been able to complete his education.  Moreover, it will be difficult if not impossible to reinstate his college place and continue his education**.

Randy was at the time of his arrest, just shy of completing an undergraduate program at the University of Michigan.  The tuition and efforts exerted are now likely lost.  He had planned on graduating and continuing his post-graduate studies.  His career plans will be dramatically changed and he will be likely to obtain even a low-level entry job upon his release.

E.  **Randy Montante will have a federal felony conviction which cannot be expunged or set aside.  He will be labeled a felon and will have to report that status.**

Randy has a close knit, proud and hardworking Filipino family that have been devastated by his arrest and the possible lengthy prison sentence.  Not only will Randy suffer the stigma of his crime, but so too will his family.  And in many regards, this may be Randy's worse punishment. In addition, although he has most of his extended family in the Filipins, he will be unable to travel there for a significant time and will inevitably miss most other the major family events.

F.  **Randy Montante will be required to pay significant fines and costs. He will be required to pay fines and costs including a $5,000.00 fine**. His family has offered to assist but they are of modest means and this is another punishment that will reduce Randy's college fund and family savings.

G. **Randy Montante will have to serve a significant period of supervised release and can be ordered to return to prison if he violates the terms and conditions of his sentence.**

The court will likely impose additional terms and conditions after he is released.  He will be restricted in many regards including the ability to use computers, travel, work and with whom he can associate.  There will also be significant sanctions if any terms of the supervised release are violated.

H. **Randy Montante's ability to travel will be restricted and he will have limited ability to visit his family and extended family as a result.**

Both of Randy's parents were born in the Filipins. As noted previously, he will not be able to have visits or visit his family for 10 years if sentenced to that term.  He will miss all the life cycle events and even while on supervised release, will be unable to travel.

There is a stigma and embarrassment attached to and associated with this conviction by not just Randy Montante but by his entire family.  This may very well be the most egregious punishment.

OTHER FACTORS FOR CONSIDERATION

*  Inability to cooperate to obtain a 5k1.1 reduction

Unfortunately, Randy Montante stayed out of trouble and does not associate with criminals.  That is unfortunately because had he associated with criminals and had information regarding criminal conduct like other defendants facing similar if not lengthier mandatory minimums, the information would have led to a motion for a downward departure and allowed this court to depart from

the mandatory minimum. But Randy has no such information.  He is not rewarded for being in school or maintaining employment.  He would only be rewarded if he knew drug dealers or information regarding a murder or carjackings.  Then he would have received a recommendation from the prosecutor for upwards of fifty percent reduction.  In addition, Randy is not eligible for the safety-valve since this is not a drug case.  In short, in relation to others who have committed assaultive crimes or offenses that mandate more time or drug offenses, Randy Montante will likely be sentenced to more time and have no avenue to reduce it.

NATURE AND CHARACTER OF RANDY MONTANTE

A.  Fully accepted responsibility.  Filed no substantive motions.

B.  No prior criminal history at all.  No prior police contact.

C.  Exemplary pre-trial conduct and a model inmate.

D.  Psychological evaluation which opines that Randy Montante is not a pedophile and is not a threat to the community

E.  Strong and supportive family (see letters attached).

F.  No allegations he ever had any sexual contact with any minors.

OTHER FACTORS

a.  Previous guidelines less severe

In the time since the guideline for production of child pornography was first promulgated, the offense level applicable to Mr. Montante's offense before acceptance of responsibility has risen by more than 20 levels and additional

points have been added for Prepubescent minor; Sadistic or masochistic conduct; Distribution and Use of computer for the possession of the material.

Most of this massive increase was mandated by Congress. Under the Sixth Circuit's decision in <u>Bistline</u>, with respect to enhancements mandated by Congress, this Court must refute Congress's reasons, whether "empirical" or "value judgments," "in terms that are persuasive on policy grounds." 665 F.3d at 763, 764. With respect to enhancements adopted by the Commission without a congressional mandate and without empirical grounds, the guideline is vulnerable precisely on that ground. Id. at 764.

In short, Randy Montante has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. This distinguishes Mr. Montante from the offenders Congress had in mind.

The enhancements for material involving prepubescent minors, material depicting sadistic or masochistic conduct, use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2. In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; 79.4% received the 4-level enhancement sadistic or masochistic material; 97.4% received the 2-level enhancement for use of a computer"; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more. U.S. Sent'g Comm'n, Use of Guidelines and Specific Offense Characteristics (2011).

These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm.  Kelly, 868 F. Supp. 2d at 1208-09.  As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." Robinson, 669 F.3d at 778 (discussing the enhancement for "use of a computer").  Such enhancements render § 2G2.2 an "anomaly."  Id.

The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," id. at xi, so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," id. at 323. Because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability."  Child Porn Report at ii, xi, 209, 323.

Based on the above analysis, this Court has ample grounds to decline to follow § 2G2.2 "in terms that are persuasive on policy grounds."  Bistline, 665 F.3d at 763, 764.  The ability to disagree on policy grounds "necessarily permits adoption of a replacement [range]."  Spears, 555 U.S. at 265; see also Phinney, 599 F. Supp. 2d at 1043 (declining to follow the 2008 version of § 2G2.2, and noting that "[b]ased on the Commission's initial approach, which was based on study, defendant's guideline range in this case would have been 6-12 months").

The only guideline based, at least in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991.

That guideline reflected the Commission's analysis of empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidenced by a 38% rate of downward departure.  See 137 Cong. Rec. H6737 (Sept. 21, 1991).  The Commission expressed concern that raising penalties even higher "may aggravate this below guideline rate and heighten sentencing disparity."  Id.

Today, below guideline sentences are imposed in 65.6% of cases sentenced under § 2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government.  See U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics, tbl.28.

While most judges do not follow § 2G2.2, others do, resulting in sentencing disparity.

b.  No opportunity to cooperate and lift mandatory sentence or reduce sentence

There are many individuals who have been involved in criminal activity. They offer the Government information.  They know murderers, rapists, drug dealers.  Information regarding criminal activity is a currency in the federal system and the currency can garner and earn a significant benefit:  less prison time.  But what happens to an individual like Randy Montante.  He does not know any drug dealers or murderers.  He has no information about doctors committing

fraud.  He has no co-defendants against whom he can cooperate.  He has otherwise followed the law, went to school, worked and has a close-knit family. Too bad for you Randy, you do not even get considered for a 5k1.1 motion for downward departure.  If you had such contacts and information, the mandatory minimum would no longer apply and this court could in theory sentence Randy to probation.

But he is essentially punished not rewarded for an otherwise exemplary history free from crime.

c.  Disparity in other similar sentences, state, etc.

There is no doubt that this exact offense in state courts including Michigan would result in guidelines that are a fraction of the federal sentencing guidelines. Statics are clear, federal sentences for similar offenses involving no physical contact and exchange of images with minors far exceeds state court sentences where the defendants had sexual contact with prepubescent minors.

d.  Little chance of residiciion

This Court must still correctly calculate the guideline range, Gall v. United States, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; Nelson v. United States, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  Kimbrough v United States, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," id. at 49-50, and explain how the facts relate to the purposes of sentencing.  Id. at 53-60; Pepper

v. United States, 131 S. Ct. 1229, 124243 (2011).  The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  Id. at 101; Pepper, 131 S. Ct. at 1242-43.

In short, imposing the mandatory minimum sentence of 15 years is still a significant sentence and takes into consideration all the 3553 factors. The collateral sanctions are perhaps equally as punitive and will have a significant and long-term effect of Randy's ability to travel, earn a living, marry, where he resides and equally as harsh, how society will look at him and classify him.  He has acknowledged his poor judgment and asks this court to consider the totality of the circumstances and prospect that he will contribute to society in imposing a sentence not exceeding the mandatory minimum, waive any fines, recommend any appropriate programs, and recommend a facility close enough for his family to travel and visit.

Respectfully submitted,


s/Sanford A. Schulman
SANFORD A. SCHULMAN P-43230
Attorney for Defendant:
     RANDY NIBUNGCO MONANTE
500 Griswold Street, Suite 2340
Detroit, Michigan 48226
(313) 963-4740
saschulman@comcast.net

Date:  August 18, 2017